UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No. 22 CR 146 |
| | ) | |
| v. | ) | Judge Sharon Johnson Coleman |
| | ) | |
| | ) | |
| MILES COOPERMAN | ) | |

**GOVERNMENT'S RESPONSE TO**
**<u>DEFENDANT'S MOTION TO DISMISS INDICTMENT</u>**

Defendant Miles Cooperman is charged with possession of a silencer, in violation of Title 26, United States Code, Section 5861(d) (Count One), and possession of a machinegun, in violation of Title 18, United States Code, Section 922(o) (Count Two). Dkt. 1. Defendant now contends that under *New York State Rifle & Pistol Ass'n v. Bruen,* 142 S. Ct. 2111 (2022), the government cannot restrict his Second Amendment right to possess a machinegun or silencer. Dkt. 22. Defendant's argument is without merit. The Supreme Court has held that regulations of machineguns and silencers fall outside the Second Amendment's ambit; *Bruen* did not alter that precedent. This Court should deny defendant's motion.

## I. BACKGROUND

On July 30, 2020, defendant's email address was identified as an account that ordered and paid for two machineguns[1] and three silencers[2] from a now defunct Russian-operated website. Special agents from ATF went to defendant's home and requested that defendant turn over the items. Defendant also admitted that he ordered the items online and that he did not register or obtain the proper authorization to possesses the silencers. Defendant went into his home and retrieved two machineguns and two silencers and handed them to ATF agents. Defendant later retrieved the third silencer from a cabin in Wisconsin and gave that item to ATF agents, too.

## II. THE CHARGES AGAINST DEFENDANT DO NOT VIOLATE THE SECOND AMENDMENT.

### A. Legal Standard.

The Second Amendment to the Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. However, "[l]ike most

---

[1] The National Firearms Act (NFA), 26 U.S.C.§5845(b), defines "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

[2] Title 18 U.S.C. § 921(a)(24), defines "firearm silencer" as "any device for silencing, muffling, or diminishing the report of a portable firearm. Including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication."

2

rights, the right secured by the Second Amendment is not unlimited; it does not allow every person "to keep and carry any weapons whatsoever in any manner whatsoever and for whatever purpose." *District of Columbia v. Heller,* 554 U.S. 570, 626 (2008). In evaluating what limitations Congress can impose on citizens' Second Amendment rights, the Supreme Court has directed courts to ask two questions: (1) whether "the Second Amendment's plain text covers an individual's conduct," *Bruen,* 142 S. Ct. at 2129–30, and (2) if not, whether "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*.

### B. Section 922(o)'s Prohibition on the Possession of Machineguns Is Constitutional.

#### 1. Possession of Machineguns Is Not Protected Under the Plain Text of the Second Amendment.

Section 922(o), which was enacted in 1986, bans the transfer or possession of a machinegun. It carves out exception for (1) the transfer to, or possession by, a person acting under authority of the United States, or (2) any lawful transfer or possession of a machinegun that was lawfully possessed before the statute's enactment.

Defendant attempts to mount a facial challenge to this statute, arguing that the law—in all its applications—violates the Second Amendment. Dkt. No. 22. This challenge fails, though, because the Supreme Court has made clear that the Second Amendment's plain text does not cover machineguns.[3]

---

[3] Defendant also challenges Illinois statutes 720 ILCS 5/24-1(a)(7) and 720 ILCS 5/24/1(a)(6), which prohibit possession of a machine gun and possession of silencer. Dkt. No. 22. Because defendant has not been charged with violating these Illinois statutes, he lacks standing to challenge their constitutionality.

3

In *United States v. Miller*, 307 U.S. 174, 178 (1939), the Supreme Court upheld against a Second Amendment challenge to two men's federal indictment for transporting an unregistered short-barreled shotgun in interstate commerce, in violation of the National Firearms Act, 48 Stat. 1236. Nearly 70 years later, in *Heller*, the Supreme Court affirmed *Miller*, explaining that *Miller's* "basis for saying that the Second Amendment did not apply was . . . that the *type of weapon at issue* was not eligible for Second Amendment protection." 554 U.S. at 622 (emphasis in original). *Heller* concluded: "We . . . read *Miller* to say only that the Second Amendment does not protect those weapons *not typically possessed by law-abiding citizens for lawful purposes*, such as short-barreled shotguns." *Id.* at 625 (emphasis added). It continued: "That accords with the historical understanding of the scope of the right." *Id. Heller* returned to *Miller* at it conclusion of the opinion. It wrote:

> *Miller* said, as we have explained, that the sorts of weapons protected were those "*in common use at the time.*" We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons."

554 U.S. at 627 (citing *Miller*, 307 U.S. at 179).

In other words, under *Heller*, the Second Amendment does not protect those weapons that were "not in common use at the time" of its passage and that were not "typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625, 627. In his motion, defendant cites data that, he contends, demonstrates that machineguns

4

are commonly used today by private citizens. Dkt. No. 22.[4] He points to no data to indicate that such weapons were used by private citizens when the Bill of Rights was enacted. Under *Miller* and *Heller*, therefore, he has not demonstrated how the plain text of the Second Amendment covers his possession of machineguns as firearms "in common use at the time" by private citizens.

Nothing in *Bruen* disturbed *Miller* or *Heller*. Instead, both concurrences in *Bruen* emphasized the narrow scope of its holding. Justice Alito, concurring, wrote that "our holding decides nothing about who may lawfully possess a firearm. Nor have we disturbed anything that we said in *Heller* or [*McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010)] about restrictions that may be imposed on the possession or carrying of guns." 142 S. Ct. at 2157. Justice Kavanaugh, joined by Chief Justice Roberts in a separate concurring opinion, noted that as the Supreme Court had previously explained in *Heller* and *McDonald*, "the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check" and that "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id.* at 2162 (cleaned up).

---

[4] According to defendant, approximately 175,977 machine guns were in private use at the time of defendant's arrest. Dkt. No. 22 at 3. Even assuming the accuracy of this number, "this number is far below the 50 million large-capacity magazines the Second Circuit held was sufficient for a showing of common use in [*N.Y. State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015)" and "also below the more than 8 million AR- and AK-platform semi-automatic rifles manufactured in or imported into the United States" that the Fourth Circuit held [in *Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016)] was sufficient for a showing of common use." *See Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016).

Multiple courts have relied on *Heller* to conclude that machineguns fall outside the Second Amendment's scope. *See, e.g., United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822 F.3d 136, 141-44 (3rd Cir. 2016) (Finding "the Second Amendment does not protect the possession of machine guns. They are not in common use for lawful purposes."); *Hollis v. Lynch*, 827 F.3d 436, 449-51 (5th Cir. 2016) (finding that machineguns do not receive Second Amendment protection because they are dangerous and unusual); *Hamblen v. United States*, 591 F.3d 471, 473-74 (6th Cir. 2009) (finding the right to keep and bear arms does not authorize an unlicensed individual to possess unregistered machine guns for personal use); *United States v. Fincher*, 538 F.3d 868, 873-74 (8th Cir. 2008) (finding machineguns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use); *United States v. Henry*, 688 F.3d 637, 639-40 (9th Cir. 2012) (finding that short of bombs, missiles, and biochemical agents, few weapons are more dangerous than machineguns and thus the Second Amendment does not apply.)[5]. The Fourth Circuit, sitting *en banc*, relied on similar reasoning to hold that semi-automatic assault rifles, like an AR-15 and large-capacity magazines, fell outside the Second Amendment. *See Kolbe v. Hogan*, 849 F.3d 114,

---

[5] At least one district court in this district has denied a *Buren*-based Second Amendment challenge to another provision of Section 922. *See United States v. John Seiwert*, 20CR443 (holding that Section 922(g)(3), which prohibits the possession of firearm by unlawful drug users and drug-addicted individuals, remains constitutional following *Bruen*.)

135-37 (4th Cir. 2017). The Fourth Circuit explained: "Are the banned assault weapons and large-capacity magazines "like" "M-16 rifles," i.e., "weapons that are most useful in military service," and thus outside the ambit of the Second Amendment? The answer to that dispositive and relatively easy inquiry is plainly in the affirmative." *Kolbe*, 849 F.3d at 136 (citing *Heller*, 554 U.S. at 627).[6]

In short, in light of binding Supreme Court precedent holding that the Second Amendment protects only those weapons "in common use" by private citizens at the time of its enactment—and the persuasive authority afforded by numerous federal appeals courts extending that conclusion expressly to machineguns—this Court should deny defendant's motion to dismiss Count Two of the Indictment because the plain text of the Second Amendment does not cover the possession of machineguns.

### 2. Prohibiting the Possession of Machineguns Is Consistent with the Nation's Historical Tradition of Firearm Regulation.

Even if this Court were to conclude that the Second Amendment's plain text protects the possession of machineguns, Section 922(o) still does not violate the Second Amendment because the statute "is consistent with this Nation's historical tradition of firearm regulation." *Bruen,* 142 S. Ct. at 2129–30.

To assess "whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding," *Bruen* contemplated two

---

[6] Although *Bruen* abrogated the *en banc* Fourth Circuit's alternative holding that relied on intermediate scrutiny, *Bruen* did not abrogate *Kolbe's* ruling about what counts as "dangerous and unusual weapons" that fall outside the Second Amendment. *Buren*, 142. S. Ct. at 2126.

7

avenues of inquiry: (1) a "straightforward historical inquiry" to search for, most relevant here, historical regulations similar to the modern-day regulatory counterpart at issue or evidence that a comparable historical regulation was rejected on constitutional grounds; or (2) a "historical analogy," for instances where there is no such straightforward correspondence between the challenged law and predecessors. *Id.* at 2131-34.

For purposes of defendant's challenge to Section 922(o), the "straightforward historical inquiry" that *Bruen* described suffices. *Heller* explained—and *Bruen* did not disturb—that this nation's "historical tradition" includes "prohibiting the carrying of dangerous and unusual weapons." 554 U.S. at 637.[7] For example, under English common law, "the offense of riding or going armed, with dangerous or usual weapons, [was] a crime." 4 W. Blackstone, Commentaries on the Laws of England 148–49 (1769). In the United States, too, courts long ago acknowledged that a man

---

[7] In support of this conclusion, *Heller* cited *Miller*, 307 U.S. at 179; 4 W. Blackstone, Commentaries on the Laws of England 148–49 (1769); B. Wilson, Works of the Honourable James Wilson 79 (1804); J. Dunlap, The New–York Justice 8 (1815); C. Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (1822); 1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors 271–272 (1831); H. Stephen, Summary of the Criminal Law 48 (1840); E. Lewis, An Abridgment of the Criminal Law of the United States 64 (1847); F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852). *See also State v. Langford*, 10 N.C. 381, 383–384 (1824) (defendants who entered home with firearms and shot a dog was a breach of peace and not merely civil trespass); *O'Neill v. State*, 16 Ala. 65, 67 (1849) (quarrelsome words in a public place alone does not constitute an offense, but quarrelsome words while armed is); *English v. State*, 35 Tex. 473, 476 (1871) (prohibition of carrying pistols, dirks and certain other deadly weapons does not violate the Second Amendment); *State v. Lanier*, 71 N.C. 288, 289 (1874) (going armed with dangerous or unusual weapons is a crime against the public peace).

commits "an offence at common law" when he "arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people." *State v. Langford*, 3 Hawks 381, 383 (NC 1824). For that reason, the Second Amendment encompasses only arms "of the kind in common use." *Heller*, 554 U.S. at 624 (quoting *Miller*, 307 U.S. at 179).

That the common-use limitation is consistent with the Second Amendment's prefatory clause: "The traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." *Heller*, 554 U.S. at 624. *Heller* recognized that "[i]t may be objected that if weapons that are most useful in [modern] military service—M-16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause" that refers to militias. *Id.* at 627-28. But *Heller* explained that "the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right." *Id.* at 628.

*Bruen* did not change this aspect of *Heller*. Instead, *Bruen* reaffirmed *Heller's* finding there is a "fairly supported" "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Bruen*, 142 S. Ct. at 2128 (citing 4 W. Blackstone, Commentaries on the Laws of England at 148-149: *Miller*, 307 U.S. at 179). *See also supra* at 6 (describing how the concurring opinions in *Bruen* continued to recognize important limitations on the right to bear arms).

9

In light of *Heller*'s conclusion that our nation's historical tradition includes regulating dangerous and unusual firearms—a conclusion rooted in a variety of historical resources wholly unrefuted by defendant—this Court should reject defendant's constitutional challenge to Section 922(o) on historical grounds, assuming it does not already conclude that the plain text of the Second Amendment does not cover the possession of machineguns.

## C. The Regulation of an Individual's Possession of a Silencer Does Not Violate the Second Amendment.

The National Firearms Act (NFA) is a comprehensive taxing scheme that regulates the manufacture, sale, and transfer of certain especially dangerous and concealable weapons. Under the NFA, the word "firearm" is a term of art that has particularized meaning; it is defined to include only those weapons listed in 26 U.S.C. § 5845(a), one of which is a silencer. *See* 28 U.S.C. § 5845(a); 18 U.S.C. 921(25) (defining a "firearm silencer" as including "any device for silencing, muffling, or diminishing the report of a portable firearm").

Federal law's regulation of the possession of silencers does not violate the Second Amendment on several grounds. First, silencers are not "arms" withing the meaning of the Second Amendment. Second, even if silencers were "arms" for purposes of the Second Amendment, they are "dangerous or unusual weapons" under the reasoning in *Heller*, and their regulation via the NFA's registration and taxation requirements is analogous to historical laws regulating commerce in firearms.

10

### 1. Possession of a Silencer Is Not Protected Under the Plain Text of the Second Amendment.

The Second Amendment applies to "bearable arms." *Heller*, 554 U.S. at 582. According to *Heller*, "the most natural reading of [the phrase] 'keep Arms' in the Second Amendment is to 'have weapons.'" *Id*. Although that protection might extend to things necessary to use arms, such as certain magazines and ammunition, or even access to firing ranges—*see, e.g.*, *Ezell v. City of Chicago,* 651 F.3d 684, 704 (7th Cir. 2011)—it does not automatically apply to anything that can be attached to a firearm, but which is not otherwise necessary to render the firearm operable. A silencer is not necessary to make a firearm operable; rather, it is exclusively a means to reduce sound omitted from an already operable firearm. "A silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence')." *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018); *see also United States v. Hasson*, 2019 WL 4573424, at *3-5 (D. MD. Sept. 20, 2019), *aff'd*, 26 F.4th 610 (4th Cir. 2022) ("Silencers generally have no use independent of their attachment to a gun. They do not fire bullets on their own and do not contain a slide, trigger, firing pin, cartridge case, barrel, primer, or gunpowder.").

Nothing in *Bruen* suggests that silencers fall within the meaning of "arms" under the Second Amendment. *Bruen* spoke of "firearm" regulations, not the regulation of firearm accessories. 142 S. Ct. at 2126, 2131-32. *Bruen* did not directly address, or somehow constitutionally shield, and individual's right to possess accessories that merely quiet an otherwise bearable arm. *See, e.g.*, *United States v.*

11

*Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (holding that a silencer is not a "bearable arm" protected by the Second Amendment); *United States v. Stepp-Zafft*, 733 F. App'x 327, 329–30 (8th Cir. 2018) (on plain error review, finding no plain error where district court failed to dismiss unregistered silencer charge on Second Amendment grounds); *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) (holding that silencers are not protected by the Second Amendment); *United States v. Grey*, Case No. CR-18-00412-CAS-1, 2018 WL 4403979, at *13 (N.D. Cal. Sept. 13, 2018) (following *McCartney*'s holding to deny motion to dismiss unregistered silencer charge on Second Amendment grounds); *United States v. Garnett*, 2008 WL 2796098, at *4–5 (E.D. Mich. 2008) (finding that nothing in *Heller* "casts doubt" on the constitutionality of the NFA's regulation of silencers).

### 2. Regulating the Possession of Silencers Is Consistent with the Nation's Historical Tradition of Firearm Regulation.

Even assuming that silencers are "arms" within the meaning of the Second Amendment, the NFA's restrictions on silencers are well in line with two historical traditions in this country: first, the already discussed historical tradition of regulating "dangerous and unusual weapons" and, second, the historical tradition of regulating commerce in firearms.

First, *Heller* recognized (and Justice Kavanaugh's concurrence in *Bruen* echoed) the "historical tradition of prohibiting the carrying of dangerous and unusual weapons." 554 U.S. at 627. In the case of silencers, these firearms accessories were perceived as dangerous almost immediately after their invention, and they were

12

quickly used to facilitate crimes. *See* Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 L. & Contemp. Probs. 231, 246-49 (2020). The silencer was invented in the early 1900s and patented in 1908. *Id*. at 246. "Objections to civilian use of silencers appeared almost immediately." *Id.* By 1909, Maine became the first state to ban the sale or possession of silencers, and New Jersey followed two years later. *Id*. at 247. The primary concern underlying the unregulated possession of silencers was crime that would be committed by both typical criminals and hunters/poachers. *Id*. "From 1909 to 1936, at least fifteen states enacted silencer restrictions," including Arizona, Louisiana, Michigan, North Carolina, Pennsylvania, and Wyoming. *Id*. at 248, n.123. Ultimately, the inventor of the silencer and his company "discontinued manufacturing silencers because of the popular impression that this invention was an aid to crime." *Id*. at 248 n.125 (*Maximum Bans Gun Silencer*, N.Y. TIMES, May 8, 1930, at 27). In short, under *Heller*, even assuming that silencers are "arms," within the meaning of the Second Amendment, they remain unusually dangerous and thus fall permissibly within this nation's historical tradition of regulation.

*Bruen* did not undermine *Heller's* recognition of the historical tradition of regulating "dangerous or unusual weapons"—in fact, it re-emphasized it. *See Bruen,* 142 S. Ct. at 2143-44. Instead, *Bruen* focused on handguns, which it described as "indisputabl[y] in common use for self-defense today." *Id*. at 2143. But silencers are not intended for self-defense, thus underscoring the particular danger they represent.

13

*See also United States v. Tagg*, 572 F.3d 1320, 1326 (11th Cir. 2009) (rejecting defendant's Second Amendment-based challenge to constitutionality of NFA and finding that "pipe bombs are not typically possessed by law-abiding citizens for lawful purposes" and therefore fall within "the historical tradition of prohibiting the carrying of dangerous and unusual weapons"); *supra at 6* (collecting cases holding that because machineguns are "dangerous and unusual," they fall outside the Second Amendment's scope).

Second, the NFA's registration and taxation requirements fall into another national historical tradition: the regulation of commerce surrounding firearms.[8] "[C]olonial governments substantially controlled the firearms trade." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017). For example, "a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals." Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 76 (2017). "A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also 'of arms and munitions.'" *Id*. In the early 17th century, Connecticut banned residents from selling firearms outside the colony. *Teixeira*, 873 F.3d at 685. Virginia provided that people were at

---

[8] Such administrative regulations cannot be said to "infringe" on the right to keep and bear arms, as prohibited by the Second Amendment. As already discussed, silencers are not "arms," within the meaning of the Second Amendment. In addition, administrative burdens of the type represented by the NFA fall far short of disarming law-abiding citizens and therefore cannot be said to "infringe" on their Second Amendment right. *See* Webster's 1828 American Dictionary of the English Language (defining "infringe" as "[t]o break; to violate; to transgress" and "[t]o destroy or hinder").

14

"liberty to sell arms and ammunition to any of his majesties loyal subjects inhabiting this colony." *Id*. at 685 n.18. And other colonial government "controlled the conditions of trade" in firearms. *Id*. at 85.

States continued to enact laws governing "the manufacture, sale [and] transport" of guns and ammunition in the 18th and 19th centuries. *Id*. at 74. For example, in 1814, "Massachusetts required that all musket and pistol barrels manufactured in the state be first tested," and it appointed a state inspector "to oversee or conduct the testing." *Id.* Likewise, in 1820, "New Hampshire created and appointed state gunpowder inspectors to examine every storage and manufacturing site." *Id*. Meanwhile, "[t]wentieth century laws extended safety regulations pertaining to gunpowder and other explosives." *Id.*

Like these early laws, the NFA's registration and taxation requirements for silencers do not prohibit possessing or even transferring them. Instead, the statute at issue merely imposes record-keeping and attendant payment requirements to document the items[9] to help ensure that they can be traced (*e.g.,* when they are

---

[9] Under the NFA, a manufacturer, importer, or dealer of a covered firearm must register with ATF as a special occupational taxpayer (SOT) on first engaging in the business; pay an occupational excise tax; and register each firearm with ATF in the National Firearms Registration and Transfer Record (NFRTR). The "maker" of a covered firearm, which his defined to mean a person who manufactures, puts together, alters, or otherwise produces a firearm, must pay a making tax of $200 for each firearm made. No person may make a firearm unless an application is filed with ATF. The maker, or subsequent transferor, may thereafter transfer the weapon only pursuant to the NFA, which requires that the maker or transferor identify itself, the firearm, and the transferee, and apply for and receive approval from ATF. The makers or transferor must then pay a transfer tax of $200 for each firearm transferred. 26 U.S.C. § 5811.

believed to have been used in a crime). Although the NFA may not be identical to the above-referenced historical statutes, *Bruen* explained that the government need only identify a "historical analogue, not a historical twin." 142 S. Ct. at 2133. In this case, the practice of the colonies and the United States of regulating commerce in firearms provides a sufficient historical analogue to the NFA.

Moreover, *Bruen* expressly did not disturb the "shall issue" licensing laws that exist in 43 states. 142 S. Ct. at 2138 n.9. And Justice Kavanaugh's concurrence emphasized that state can constitutionally require license applicants to "undergo fingerprinting, a background check, a mental health records check and training in firearms handling and in law regarding the use of force, among other possible requirements." *Id.* at 2162. A registration scheme for silencers is no more burdensome than the kind of requirements that the Supreme Court already has found to be constitutionally unproblematic.

### III. CONCLUSION

For the reasons stated above, defendant's motion to dismiss the indictment should be denied.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:    */s/ Shawn McCarthy*
SHAWN D. McCARTHY
Assistant United States Attorney
United States Attorney's Office
219 South Dearborn, 5th Floor
Chicago, Illinois 60604
(312) 353-8881
